FILED
12/16/2025
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 29, 2025 Session

## AUTUMN L. ET AL. v. JAMES C.

**Appeal from the Chancery Court for Maury County**
**No. A-001-22        M. Caleb Bayless, Judge**

_____

**No. M2024-01350-COA-R3-PT**
_____

Mother and Stepfather sought to terminate Father's parental rights to two minor children, alleging abandonment by failure to conduct more than token visitation. The trial court determined that the regular video-call visitation exercised by Father was not token, but that to the extent that the visitation could be considered token, Mother's interference prevented a finding that such abandonment was willful. Father's rights were not terminated. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which CARMA DENNIS MCGEE and VALERIE L. SMITH, JJ., joined.

Shawn D. Snyer, Columbia, Tennessee, for the appellants, Autumn L., and Timothy B. L.

Adam Zanetis, Franklin, Tennessee, for the appellee, James C.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

The marriage of Petitioner/Appellant Autumn L. ("Mother") and Respondent/Appellee James C. ("Father," and together with Mother, "the parents") produced two daughters, Avonlea D.C., born in March 2015, and Journey W.C., born in December 2016.[1] The parents separated shortly after Journey's birth and were divorced by

_____

[1] In cases involving petitions for the termination of parental rights, it is this Court's policy to remove the full names of children and other parties to protect their identities.

the District Court for El Paso County, Colorado ("the Colorado court") in January 2018. The Colorado court designated Mother as the children's primary residential parent and awarded Father "parenting time as arranged between the parties."

Father remarried in March 2019, and moved to Germany in September 2019 to support his wife's career. Mother remarried Petitioner/Appellant Timothy B.L. ("Stepfather," and together with Mother, "Appellants") in November 2019. Appellants remained in Colorado with the children.

In February 2020, Father petitioned the Colorado court to modify the parenting plan. The Colorado court entered an agreed modified parenting plan in November 2020. The modified plan permitted Mother to move with the children to Tennessee. Father was awarded weekly video calls with the children on Friday evenings; the Colorado court noted that the calls "shall not have a max amount of time, but rather shall last as long as the minor children remain engaged and talking with Father." Father had also requested in-person parenting time with the children in the summer of 2021, when he planned a brief return stateside, but the parents had not come to an agreement regarding the specifics of the visit. The Colorado court directed the parents to attempt to agree on a schedule or submit to binding arbitration.

Appellants filed a petition to register a foreign decree and for step-parent adoption and termination of parental rights, or for relocation or modification of the parenting plan in the Chancery Court for Maury County, Tennessee ("the trial court") on January 20, 2022. Appellants sought to enroll the January 2018 and November 2020 orders entered by the Colorado court.[2] Appellants alleged that the ground of abandonment supported termination of Father's parental rights and that the termination of Father's rights was in the children's best interests. Alternatively, Appellants sought permission to relocate with the children to Australia, to support Stepfather's education and career opportunities. Appellants argued that the relocation would not affect Father's parenting time, such that the parenting schedule would not need to be modified.

On February 3, 2022, Father filed a motion in the Colorado court seeking to exercise unsupervised in-person visitation with the children from February 27 through March 5, 2022. Noting that Mother had not filed an objection, the Colorado court granted the motion by order of February 22, 2022.[3]

On February 10, 2022, Father moved to dismiss the petition in the trial court for insufficient service of process and for lack of personal and subject matter jurisdiction. Father then filed an objection to the enrollment of the foreign decree and motion to dismiss in September 2022. Father argued that Appellants had only attached the earliest parenting

_____

[2] Only the January 2018 order was included as an attachment to Appellants' petition.
[3] At trial, Mother denied receiving service of the motion prior to the entry of the resultant order.

plan entered by the Colorado court, and not the modified plan entered in November 2020. Father also argued that Appellants had failed to include a statement under penalty of perjury that the attached order had not been altered, as required by Tennessee Code Annotated section 36-6-229. Father again argued that the trial court lacked subject matter jurisdiction over the proceeding, which remained with the Colorado court.

Appellants filed an amended petition shortly thereafter, alleging that the November 2020 order had been mistakenly omitted from their initial petition. Appellants affirmed that the orders of the Colorado court had not been altered.[4] Appellants further alleged that Father had relocated to Tennessee, such that all parties were Tennessee residents and the trial court possessed subject matter jurisdiction over the litigation.

The trial court denied Appellants' amended petition to enroll a foreign decree by order of September 26, 2022, finding that the request was "not properly supported with the declaration by [Appellants]." Thus, Father's motion to reject the enrollment of the decree was granted. The trial court did not dismiss the amended petition as a whole, in light of the other forms of relief requested. The order did not include an explicit ruling on Father's arguments as to the trial court's subject matter jurisdiction.

Father answered Appellants' amended petition in October 2022. Father denied that any grounds supported the termination of his parental rights and raised the affirmative defense that any alleged misconduct was not willful. Father also submitted a counter-petition to modify the November 2020 parenting plan, alleging that Mother's continued efforts to interfere with and ultimately prevent his visitation and his relocation to Tennessee amounted to a material change in circumstance.

Appellants' petition for termination of Father's parental rights and for step-parent adoption was eventually heard over the course of seven days between November 2023 and February 2024.[5] By the end of the trial, the older child was almost nine years old and the younger child was seven years old. Testimony was heard from Mother, Father, Stepfather, and the children's most recent counselor. We will recite only that testimony relevant to the limited issues raised on appeal regarding Father's visitation with the children.

Visitation in 2017, 2018, and early 2019 was sparse, as Father traveled for weeks at a time with his now-wife for her work assignments, before coming back to Colorado. Father did not exercise any overnight visitation with the children during this time. Father began having video calls with the children in early 2019. Father exercised several in-person

---

[4] Appellants stated in the body of the amended petition that, "To the extent the Court deems [Appellants] failed to do so in their initial filing, [Appellants] affirm that the 2020 Colorado order has not been modified." The amended petition was then accompanied by a sworn statement of Appellants that the facts set forth in the petition were true to the best of their "knowledge, information, and belief."

[5] At the start of trial, the trial court bifurcated the termination and adoption issues from the relocation and modification of the parenting plan issues.

visits prior to his move to Germany in September 2019, but no additional in-person visits occurred for the remainder of 2019.

Father testified that part of the decision to travel to Germany was the strain living apart would have placed on his relationship with his wife. But he explained that finances also played a large part in the initial decision to travel with his then-girlfriend and the later decision to move to Germany, as his wife was making more money than him and covering the majority of their expenses. By remaining with his wife rather than living separately so he could attempt more in-person visitation, Father stated that he prioritized being able to provide financial support for the children. Before the move, Father testified that the parents had loosely agreed to regular video calls, as well as the potential for Father returning for in-person visits and paying for Mother and the children to travel to Germany. He explained that Mother offered "no pushback" to these suggestions and that "if that were the case, [he and his wife] never would've left."

Mother agreed that these discussions were held, but denied that any concrete agreements were made. She explained that she did not allow video calls for several months after Father's move, following guidance from a counselor that "FaceTime is not supposed to be the only relationship that a parent has" with their children. Mother broached the subject of resuming video calls in 2020, leading to Father's February 2020 petition for modification of the parenting plan. Pursuant to the Colorado court's order, weekly video calls began in fall 2020; Father did not have any contact with the children between September 2019 and September 2020. Mother testified that the older child "had a hard time adjusting" to resuming contact with Father. In particular, she explained that the older child became distraught during an early 2021 video call in which Father discussed an upcoming in-person visit.

Father visited the children in Tennessee in May 2021, as contemplated by an order of the Colorado court.[6] On the first day of the visit, Mother, Father, and the children spent several hours at the zoo. Mother testified that at one point the older child expressed discomfort with Father's attempt to kiss the child on the cheek. Mother testified that Father reacted negatively to her request that he respect the children's bodily autonomy.

Mother testified that she informed Father the following day that she would not allow any further visitation during his time in Tennessee. After Mother was informed that prohibiting visitation would violate the Colorado court's order, Father exercised four more visits with the children. Mother testified that Father again tried to kiss the older child on the cheek at one point, which the child was visibly uncomfortable with, but stated that Father respected the children's later request to only receive hugs. Regarding his connection

---

[6] The order was not made an exhibit at trial and there was some disagreement as to the specific dates included in the order. Ultimately, the parties agree that Father exercised in-person visitation with the children on May 20, 22, 23, 24, and 25, 2021.

- 4 -

with the children during this visit, Father admitted that "there was maybe some hesitation at first[,]" but after that, the interaction went well: "They were crawling on my back, piggyback, tickle fights. Normal interactions that I would assume I would have on a day-to-day basis." Several videos recorded during the remainder of the May 2021 visits were entered, with Mother acknowledging they showed positive interactions between Father, Father's wife, and the children, including appropriate physical contact initiated both by the children and by Father.

Mother testified that the older child cried before and after saying goodbye to Father at the final May 2021 visit. Mother stated that the child "did have a bond" with Father and not knowing when she would see him again was confusing for the child. Mother explained that she began questioning the propriety of future in-person visitation shortly after the May 2021 visits, based on the children's negative reaction to Father leaving.

Mother testified that Father traveled to Virginia in early September 2021 without informing her or requesting to see the children. She stated that learning of this trip was "a defining moment for [her], that the girls were not a priority to [Father]. They were only a convenience when he wanted to see them, and [she] wasn't going to allow them to go through that anymore, so [she] decided that it was time to terminate his rights." Mother admitted that she did not discuss the nature of the trip with Father at any point. Father testified that the trip was financed by the client whose wedding he was hired to photograph. Father admitted that he did not communicate with Mother regarding visiting with the children because the financial cost of arranging for a visit at that time was prohibitive and he did not believe Mother would have agreed to visitation.

Mother explained that Father contacted her in late September 2021 to discuss in-person visitation during his impending return from Germany in early 2022. Mother agreed at that time that Father would be able to have visitation with the children during the older child's spring break as long as the visits were supervised, but no visits were expressly scheduled. Mother later told Father that only some of the suggested dates would work, because she was due to have a baby around that time. Mother did not have an explanation for why she discussed allowing visitation in February and March 2022, even after deciding to petition for the termination of Father's rights.

Despite the Colorado court's order granting Father unsupervised visitation with the children from February 27, through March 5, 2022, Father did not have in-person visitation during that time. Mother admitted that she prohibited Father from exercising in-person visitation with the children on February 27 and 28, and March 1 and 2, 2022, in violation of the order. Mother further admitted that no visitation occurred on March 3, 4, and 5, 2022, but she stated that because Father did not message her on those specific dates requesting to visit with the children that day, she had not "prohibited" Father from having those visits. Mother stated that visits did not occur because she was unsure of the validity of the Colorado court's order granting unsupervised visitation. As a result, Father last saw the

children in person in May 2021.

Father stated that he exercised every video call awarded by court order, other than those prohibited by Mother, almost two hundred calls since fall 2020. According to the Colorado court's November 2020 order, the video calls originally began at 6:00 p.m., with no set duration. Once the older child began attending school, the calls, on Mother's request, would start at 7:30 a.m. and go to about 8:00 a.m., which Mother explained was "kind of a hard cutoff" because the older child would need to leave for school. Mother explained that there have been some days where the children would not yet be awake and would not want to join in the call. On those mornings, Mother explained that she leaves it up to the children to decide whether to participate. Mother testified that between 30 and 50% of the 2021–2022 video calls did not involve both children for the entire duration of the call. Father testified that his requests to reschedule the calls to the weekend or after the school day were denied by Mother.

Mother acknowledged that Father has "followed through with his FaceTime calls, he has followed through with the visitations that he had, either in our loose language or in our stipulated parenting plan for 2021." Mother testified that she originally allowed Father to have video calls with the children on their birthdays to be able to open presents together, in addition to the regularly scheduled weekly calls. However, "[t]hat changed when [she] filed the termination paperwork after [she] saw that he came back stateside. That's when [her] heart changed to having additional FaceTime calls." Father exercised sixteen out of seventeen possible video calls between September 2021 and January 2022, for a total of approximately eight hours of visitation. Mother admitted that she denied the remaining regularly scheduled video call on January 7, 2022.

Mother testified that during "an average good call," the children would show Father "a toy or whatever they're working on," Father would ask "essentially like a script of questions" about the previous week, and the call would eventually turn to "wanting to just be silly and do face filters." Mother testified that there were also "bad" calls, mostly when "hard topics" were brought up. Father related that there were several occasions where he was left waiting for the children to join the call, only for the designated time to expire and the call to be disconnected without any explanation. He testified that there were also multiple occasions where Appellants ended the video call before he finished saying goodbye to the children.

Mother stated that the children do not ask for additional calls or visitation with Father. She opined that the cessation of the weekly video calls would not have any effect on the children. Mother opined that terminating Father's parental rights would be in the children's best interests as he had "proved just time and time again that the girls are there as a convenience[,]" and had "reduced himself to be a face on a screen for years." Mother further stated that seeing Father in person again would "bring up a lot of traumatic emotions" for the children. She stated her belief that Father had not seen the children in so

long that the children did not have a stable relationship with Father and did not expect to have such a relationship. Stepfather generally agreed with these sentiments.

Father explained his understanding that "the video calls were meant to supplement and never meant to replace in-person visitation." He admitted that the decision to move to Germany and his financial limitations played a major role in the lack of in-person visitation; but so too did he believe Mother's interference played a role. With the benefit of hindsight, considering the degradation of his co-parenting relationship with Mother and the limitations on his employment and travelling opportunities posed by the COVID-19 pandemic, Father testified that he would not have chosen to move to Germany in 2019. Still, Father testified that the video calls accomplished his goal "to keep up with what [the children] were doing, interact with them, keep them engaged." Father acknowledged that it would take some time to reacclimate to having an in-person relationship, but he believed that he was able to establish a bond with the children even through the video calls alone.

Mother testified that Appellants had discussed the ongoing litigation with the children, going so far as to tell the children that their last names would be changed to match Stepfather's and that they would be moving to Australia. As part of this conversation, Appellants told the children that they would no longer be legally related to Father. Mother stated that having this conversation with the children while they were ages eight and six, respectively, was in their best interests, but admitted that it would be "very hard" on the children if these things did not actually come to be. Stepfather agreed that the discussions about the ongoing litigation and the potential outcomes had followed direct questions from the children. Father explained his belief that Appellants making negative comments about him to the children had "poison[ed] the well" and contributed to the children's negative perception of him and their relationship.

The children have seen several therapists since the parents' divorce, mostly for processing their emotions related to communication and visitation with Father. Allison Clanton, the children's current counselor, was stipulated as an expert in child and family therapy. She explained that she had been engaged by Mother to assess the attachment between the children and Stepfather, and to assess the children's mental health. Between July and December 2023, Ms. Clanton met twice with Mother; twice with Appellants; twice with the children together and separately; once with the children and Stepfather; once with Appellants, the children, and Appellants' child; and once with Appellants and the children. Ms. Clanton described the children as "brilliantly above-average developmentally in their emotional intelligence, both girls, able to understand not only their own emotional and internal thoughts, but also accurately read others' cues and understand what others are trying to convey or may be feeling."

Ms. Clanton explained that the first three to five years of a child's life "are incredibly impactful on both the development of their personality, functionality, and their ability to relate to others in this world[.]" She stated that a parent consistently responding to a child's

needs, especially during the first five years, "is fundamental in getting to the ability to have a secure attachment or not." She clarified that an insecure attachment can be repaired, even after age five, but that research suggests that "for every month a child has had less than healthy attachment connections, it takes a year to repair that."

Ms. Clanton testified that it is "extremely difficult" for a secure attachment to develop without the parent being physically present, particularly because playing and touch are a young child's primary form of communication. According to Ms. Clanton, being able to communicate love "without being physically present for a young child is extremely difficult, dare I say impossible." She explained that "certainly children can develop very loving relationships with friends and with relatives all around world[,]" based on improvements in technology, but distant relatives are not able to "fill the gap of caregiving [] directly to the child[.]" Still, Ms. Clanton testified to her belief that "every child needs as many supportive adult relationships as they can have."

Ms. Clanton was not hired to assess the children's relationship with Father and had never communicated with Father; however, she testified to watching approximately two hours of recorded video calls between Father and the children. Ms. Clanton described the relationship as "distant." She explained that the children "feel pretty resolved" that Father had chosen his wife over them and they did not "really have a desire to make it better, reconnect, connect more moving forward[.]" Ms. Clanton did not believe that, at the children's current ages, "repair could have been done via a screen without more frequent physical connection." Regardless, Ms. Clanton opined that "to the extent that it's possible for children their ages," the children had cultivated a positive relationship with Father through primarily video visitation, if not a secure attachment. Ms. Clanton agreed that Mother's behavior in prohibiting visitation and discussing the litigation would have had an alienating effect on the children's relationship with Father.

The trial court entered its order on the termination and adoption issues on March 14, 2024. As to the sole ground for termination alleged, the trial court considered Father's visitation with the children from September 2021 through January 2022. The trial court found that Father had sixteen video calls but no in-person visits during the relevant period. Based on the physical distance between the children and Father when he lived in Germany, the trial court concluded that this amounted to more than token visitation. The trial court further concluded, in an abundance of caution, that any failure to visit during the relevant period was not willful based on Mother's interference. The trial court also reviewed the best interest factors, relying in large part on the testimony of Ms. Clanton regarding the lack of a secure parental attachment between Father and the children.[7] The trial court concluded that termination of Father's parental rights would be in the children's best interests, had a ground for termination been established. But because no ground for

_____

[7] The trial court noted that Ms. Clanton's testimony was only considered in regard to the children's best interests and not the ground of abandonment.

- 8 -

termination had been established by clear and convincing evidence, the trial court denied Appellants' petition as to the termination and adoption issues.

Appellants' request to relocate and the cross-requests for modification of the parenting plan were heard in May 2024, with the trial court entering its order on August 13, 2024. The trial court found, and the parties agreed, that a material change in circumstance had occurred. The trial court found that there was proof that moving to Australia would harm the children's relationship with Father and no proof that moving would benefit the children. Thus, the trial court denied Appellants' request for leave to relocate. After considering the best interest factors, the trial court determined that Mother would remain the children's primary residential parent. The permanent parenting plan stated that "Father's parenting time shall be based on the advice and recommendations of the family therapist. The family therapist will make the determinations necessary to decide when and how any sort of visitation progresses between Father and Minor Children." Pending any additional court orders, Father's parenting time was not to exceed visitation every other weekend and Wednesday evening on the off week, and up to two weeks during school breaks.

This appeal followed.

## II. ISSUES PRESENTED

Appellants raise the following issues on appeal:

1. Whether the trial court erred by performing a quantitative, and not qualitative, analysis on the issue of token visitation.
2. Whether the trial court erred in finding that any failure by Father to visit during the relevant four-month period was not willful.
3. Whether the trial court erred in finding that Father's visitation was not token visitation.

Beyond opposing Appellants' assignments of error, Father seeks his reasonable appellate attorney's fees.

## III. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). In Tennessee, termination of parental rights is governed by statute, which identifies "situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting

*In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). "[P]arents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *In re Carrington H.*, 483 S.W.3d at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (citation omitted); *accord* *In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018) ("Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases.").

Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Carrington H.*, 483 S.W.3d at 522. The standard "ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005)).

Because of the high burden of proof in termination cases, the standard of review is somewhat different than our typical standard under Rule 13 of the Tennessee Rules of Appellate Procedure. As the Tennessee Supreme Court has explained:

> To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).
>
> Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo

review with no presumption of correctness. *See **In re M.L.P.***, 281 S.W.3d 387, 393 (Tenn. 2009); *see also **In re Samaria S.***, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. ***In re Angela E.***, 303 S.W.3d [240,] 246 [Tenn. 2010)].

***In re Markus E.***, 671 S.W.3d 437, 457 (Tenn. 2023).

### IV. ANALYSIS

### A. Abandonment by Failure to Visit

The initial question in any termination of parental rights appeal involves whether at least one ground to terminate the parent's rights was established by clear and convincing evidence.[8] *See **In re Valentine***, 79 S.W.3d at 546. Tennessee Code Annotated section 36-1-113(g)(1) provides that abandonment by a parent is a ground for the termination of parental rights and, in turn, Tennessee Code Annotated section 36-1-102 defines the term "abandonment."[9] As relevant to this appeal, a parent has abandoned a child when, "[f]or a period of four (4) consecutive months immediately preceding the filing" of the termination

---

[8] We acknowledge that no explicit ruling was made regarding Father's argument that the trial court lacked subject matter jurisdiction over this case. *See* Tenn. R. App. P. 13(b) (requiring this Court to consider the trial court's jurisdiction over the subject matter, "whether or not presented for review"). However, the record is clear that (1) Appellants and the children moved to Tennessee more than six months prior to the filing of Appellants' petition and (2) Father moved to Tennessee while the case was pending, such that the parties and the children all resided in this state prior to the trial court's adjudication of any issues. *See* Tenn. Code Ann. § 36-6-218(2) (allowing a Tennessee court to modify another state's child-custody determination when a court of this state has jurisdiction to make an initial custody decision and determines that the child and the child's parents no longer reside in the other state); Tenn. Code Ann. § 36-6-216(a)(1) (allowing a Tennessee court to make an initial child-custody determination if the child has resided in this state for at least six consecutive months prior to the filing of a custody proceeding). Nor has an argument been raised that Colorado retains any continuing interest in the custody of the subject children. We therefore find no error in the trial court's implicit determination that it possessed subject matter jurisdiction to adjudicate Appellants' petition for termination and adoption or for relocation and modification. *See **Morgan Keegan & Co. v. Smythe***, 401 S.W.3d 595, 608 (Tenn. 2013) (holding that, "when construing orders and judgments, effect must be given to that which is clearly implied, as well as to that which is expressly stated").

[9] Throughout this Opinion, we cite to the statutes that were in place at the time the initial petition was filed in January 2022, as the amended petition did not include substantive alterations. *See **In re Disnie P.***, No. E2022-00662-COA-R3-PT, 2023 WL 2396557, at *4 (Tenn. Ct. App. Mar. 8, 2023) (applying the statutes in effect when the second amended termination petition was filed, as that was the first petition to correctly identify the parties and allege grounds for termination against both parents); ***In re P. G.***, No. M2017-02291-COA-R3-PT, 2018 WL 3954327, at *7 (Tenn. Ct. App. Aug. 17, 2018) (concluding that the amended petition "was not a 'separate and distinct' petition from the original petition, as the facts alleged in the initial petition and the amended petition were largely identical," such that the amended petition related back to the filing of the initial petition). However, we note that no relevant changes had been enacted by the time the amended petition was filed in September 2022.

petition, the parent "failed to visit" the child. Tenn. Code Ann. § 36-1-102(1)(A)(i). A failure to visit involves "the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)I. When the parent's visitation, "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[,]" it is considered token. Tenn. Code Ann. § 36-1-102(1)(C). Here, the relevant four-month period is September 20, 2021 to January 19, 2022.[10]

The trial court determined that Father's sixteen thirty-minute video calls with the children during this period constituted more than token visitation, such that Father had not abandoned the children as that ground is defined. Appellants argue that the trial court erred in only considering the number of calls, rather than whether the calls allowed for the cultivation of a meaningful relationship between Father and the children. Relying on Ms. Clanton's testimony regarding the importance of physical presence in a child's formative years, Appellants argue that "despite the amount of visits that occurred during the four-month period, the substance of those visits was always destined to be token[,]" based on their digital nature. Respectfully, we disagree.

This Court has previously questioned whether "telephonic" visitation with a child can be considered as a substitute for in-person visitation for purposes of this ground. *See, e.g.*, ***In re Candace J.***, No. M2015-01406-COA-R3-PT, 2016 WL 944268, at *7 (Tenn. Ct. App. Mar. 11, 2016) ("[W]e conclude that Mother's phone conversations with S.D.J. were not a sufficient substitute for the in-person visitation that Mother could have exercised if she had appropriately prioritized the need to do so."); ***In re Kaiden T.***, No. M2014-00423-COA-R3-PT, 2014 WL 7149215, at *6 (Tenn. Ct. App. Dec. 15, 2014) ("[T]elephone calls are not generally a substitute for in-person visitation for the purposes of determining whether a parent has willfully abandoned a child."); ***In re Amelia M.***, No. E2012-02022-COA-R3-PT, 2013 WL 4715043, at *9 (Tenn. Ct. App. Aug. 30, 2013) ("We find no precedent in which Tennessee appellate courts have held that telephone calls may function as visitation for purposes of determining whether a parent has willfully abandoned a child."). This line of thinking has apparently been extended even to video calls of the type that occurred in this case. *See* ***In re Camdon H.***, No. E2017-02311-COA-R3-PT, 2018 WL 6131547, at *8 (Tenn. Ct. App. Nov. 21, 2018) ("The Parents alleged that they maintained contact through telephone calls and video chats. Such contact is not a substitute for in-person visitation as required by statute.").

We have held, however, that telephone calls may be sufficient under circumstances

---

[10] "The applicable four month window . . . includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed." ***In re Jacob C.H.***, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014); *see also* ***In re P. G.***, 2018 WL 3954327, at *7 (considering the four months prior to the initial petition when the amended petition related back).

where the parent cannot feasibly exercise in-person visitation. *See, e.g.*, *In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *6 (Tenn. Ct. App. Aug. 15, 2023) (reversing a finding of token visitation where the testimony established that in-person visitation would have threatened the mother's sobriety and pregnancy and the mother instead exercised approximately twelve video calls with the child during the relevant period); *In re Billy T.W.*, No. E2016-02298-COA-R3-PT, 2017 WL 4317656 (Tenn. Ct. App. Sept. 27, 2017) (finding that the petitioner had not established token visitation where the father moved out of state for employment and had no in-person visits with the children during the relevant period, but spoke with the children by telephone "about once a week"); *In re Caira D.*, No. M2014-01229-COA-R3-PT, 2014 WL 6680696, at *7 (Tenn. Ct. App. Nov. 25, 2014) (holding that twenty-minute phone calls every other week was more than token because the parent lived seven hours away from the children, was of limited means, and did not have a driver's license). Indeed, it appears that during the COVID-19 pandemic, video-conference visitation was often exercised in place of in-person visitation, particularly when children were in the custody of the Tennessee Department of Children's Services ("DCS"). *Cf. In re Bonnie E.*, No. E2021-00919-COA-R3-PT, 2022 WL 1572945, at *5 (Tenn. Ct. App. May 19, 2022) (stating that the testimony "gave the impression that DCS primarily offered Mother visits via video or telephone calls due to the Covid-19 pandemic"); *In re Analesia Q.*, No. E2021-00765-COA-R3-PT, 2022 WL 1468786 (Tenn. Ct. App. May 10, 2022) (finding that pandemic restrictions meant that "once a week phone calls were the only available mode of communication" between the father and the child, and a lack of proof as to how many calls were exercised prevented a finding of token visitation).

Whether a visit is token "under the circumstances of the individual case" is a particularly fact-intensive inquiry. Tenn. Code Ann. § 36-1-102(1)(C); *In re Keri C.*, 384 S.W.3d 731, 748 (Tenn. Ct. App. 2010). In making this determination, courts look at the entire constellation of facts surrounding visitation, including the "frequency, duration, and quality of the visits that occurred." *In re Keri C.*, 384 S.W.3d at 750. We also consider any evidence of "the parent's conduct and the relationship between the child and the parent up to this point." *Id.* at 749. Based on this law, we have previously affirmed a finding of abandonment when the parent appeared at every weekly visitation that he was able prior to incarceration, but the visitation was nevertheless token in nature because the parent was physically aggressive and inappropriate with the children. *In re Joseph G.*, No. E2012-2501-COA-R3-PT, 2013 WL 3964167, at *9 (Tenn. Ct. App. July 31, 2013) (also concluding that the mother's few visits were perfunctory because the mother was intoxicated, verbally abusive, and inappropriate with the children); *see also In re William B.*, No. M2020-01187-COA-R3-PT, 2021 WL 4935740, at *20–21 (Tenn. Ct. App. Oct. 22, 2021) (where the mother attended all available visits, but was late to some, left early from others, and at all but one visit acted erratically, aggressively, or indifferently toward the child). In another case, the mother attended all but two visitations that were provided during the four-month period. *See State Dep't of Child.'s Servs. V. L.L.T.*, No. E2003-00501-COA-R3-JV, 2003 WL 23094559, at *4 (Tenn. Ct. App. Dec. 30, 2003). But the

DCS caseworker testified that the mother fell asleep, was intoxicated, and got into an argument with the father during various visits. *Id.* We therefore affirmed the trial court's finding that the mother's visitation was merely "perfunctory" and that the mother had in fact failed to visit the child in more than a token fashion. *Id.* And in considering whether telephonic visitation was token, we have emphasized that contact with the child must be the main goal and outcome of the call. *See In re Princeton W.*, No. W2023-00884-COA-R3-PT, 2024 WL 4853478, at *3 (Tenn. Ct. App. Nov. 21, 2024) (finding token visitation despite the mother having brief interactions with the child during video calls, where the primary purpose of the calls was to speak with the mother's mother and siblings, not the child); *In re Metric D.*, No. M2023-00700-COA-R3-PT, 2024 WL 3948615, at *6 (Tenn. Ct. App. Aug. 27, 2024) (finding token visitation where the mother's video calls with the child were "sporadic" and the mother often talked to the foster mother more than the child during the calls).

Of course, in this case there is no dispute that Father lived in Germany during the entire four-month period at issue. Beyond the obvious physical distance between himself and the children, Father testified at great length regarding the travel limitations posed by his difficult financial situation and the COVID-19 pandemic.[11] There is no question that during the relevant period, Father exercised every video call with the children allowed by the agreed parenting plan entered by the Colorado court, save for one call that was prevented by Mother. There was no evidence that Father had any aim for the calls other than building a relationship with the children, or that Father was distracted from this purpose or otherwise acted inappropriately during the calls. While there was testimony that the children struggled with having only video visitation with Father, there was also testimony that the children were excited to see Father and they were able to be silly together on the calls. Despite her reservations regarding the lack of in-person visitation, Ms. Clanton agreed that Father was able to establish a positive relationship with the children through the video visits. Thus, the record shows that the video calls were of both sufficient quantity *and* quality to be considered more than merely "perfunctory visitation" and to establish more than "minimal or insubstantial contact" with the children. *See* Tenn. Code Ann. § 36-1-102(1)(C). As a whole, we cannot conclude that the evidence preponderates against the trial court's finding that Father's visits were more than token under the circumstances.

As we agree that there was no failure to visit, our review could stop here. Like the trial court, however, we will briefly address the question of Father's willfulness. A parent may raise as an affirmative defense that the failure to engage in more than token visitation was not willful. Tenn. Code Ann. § 36-1-102(1)(I). In that case, the parent bears the burden of proving the absence of willfulness by a preponderance of the evidence. *Id.* Willfulness in terms of parental rights "does not require the same standard of culpability as is required

---

[11] Although the trial court questioned the sufficiency of Father's efforts to remedy his financial limitations "during the years of 2017 through 2019," the trial court did not similarly question Father's credibility as to the financial constraints in effect during more recent years or the relevant period.

- 14 -

by the penal code. Nor does it require malevolence or ill will." ***In re Audrey S.***, 182 S.W.3d at 863 (citations omitted). Instead, a parent's failure to visit is willful when it is "the product of free will, rather than coercion"; accordingly, such failure "is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." ***Id.*** at 864 (citations omitted).

Much ado has been made in this case about Father's choice to travel with his now-wife in 2017 and 2018, his choice to move with her to Germany in 2019, and his choice to remain in Germany despite knowing that the children were upset by the lack of in-person visitation. Appellants argue that the trial court should have placed more weight on these choices in considering whether Father had willfully failed to visit the children. Appellants also highlight that, despite Mother not denying him any parenting time, Father did not have many in-person visits with the children prior to leaving for Germany in 2019. While true, these arguments do not take into account the many steps Mother has since taken to limit Father's ability to visit and form a stronger relationship with the children.

There is no question that Mother prevented Father from exercising the regularly scheduled video call on January 7, 2022. Mother also prevented Father from exercising court-ordered in-person visitation with the children in February 2022. *Cf.* ***In re Chelbie F.***, No. M2006-01889-COA-R3-PT, 2007 WL 1241252, at *7 (Tenn. Ct. App. Apr. 27, 2007) (explaining that court orders are "designed to resolve disputes so that litigants do not resort to private remedies"). And Mother admittedly began limiting Father's video calls with the children to only once per week after Appellants filed to terminate his rights, even though she had previously allowed additional calls for the children's birthdays and other holidays. Beyond reducing the frequency of the visits, Mother also decided that the video calls would occur before the school day, thereby unilaterally instituting a thirty-minute time limit on the visits. So although we agree that Father initially made choices that prioritized his wife's career and their mutual financial opportunities over his ability to visit with the children in person, Mother then made choices that actually prevented him from exercising additional visits and significantly interfered with his efforts to develop a closer connection with the children. *Compare* ***In re B.D.***, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *9 (Tenn. Ct. App. Mar. 2, 2009) (finding that the mother had not willfully abandoned the children where she had three in-person visits during the relevant period before moving out of state "to be near family support" and DCS's lack of assistance and "transportation and financial issues" prevented additional in-person visitation, but she "stayed in regular contact with the children by telephone and letters"), *and* ***In re Archer R.***, No. M2019-01353-COA-R3-PT, 2020 WL 820973, at *6 (Tenn. Ct. App. Feb. 19, 2020) (finding that the father had not willfully abandoned the child despite moving out of state, when the mother would not respond to his requests for visitation), *with* ***In re Candace J.***, 2016 WL 944268, at *7 (finding that the mother's "phone conversations with [the child] were not a sufficient substitute for the in-person visitation" where the only obstacle preventing in-

person visitation was the passing of consecutive drug screens). We also find no merit in Appellants' argument that Father's travel in September 2021 is of "paramount importance" to this issue, considering his unrebutted testimony that the trip was financed by a photography client and that he reasonably believed that Mother would have prevented visitation. We therefore affirm the trial court's ruling that the limited visitation exercised by Father during the relevant period was the result of Mother's efforts, and thus, not willful.

During the trial, Ms. Clanton placed significant emphasis on a child's need for the physical presence of a parent, and the negative impact of Father's travel during the first few years of the children's lives on the security of their attachment. However, "a decision not to grant a petition to terminate parental rights does not mean that custody of the child is returned to the respondent parent." *In re J.R.P.*, No. M2012-02403-COA-R3-JV, 2013 WL 4477860, at *10 (Tenn. Ct. App. Aug. 19, 2013). "The issue before us is confined to whether, under the circumstances of this case," the evidence supports a decision "to completely terminate the parent-child relationship." *Id.* In this case, we are not convinced that Father's previously limited opportunities to parent the children in person justifies removing any potential ability for him to do so in the future, in light of Mother's efforts to interfere with his relationship with the children. *Compare* **In re Archer R.**, 2020 WL 820973, at *10 (not terminating the father's parental rights where the mother's interference with visitation prevented him from forming a meaningful relationship with the child), *with* **White v. Moody**, 171 S.W.3d 187 (Tenn. Ct. App. 2004) (terminating the father's parental rights where he had only sporadic visitation with the child and the child had "no connection" with the father, but the mother did not interfere with the parent-child relationship); *see also* **In re Kaedince M.**, No. E2015-00763-COA-R3-PT, 2015 WL 6122776, at *7 (Tenn. Ct. App. Oct. 19, 2015) ("Decisions regarding the termination or preservation of parental rights are neither a punishment to be meted out nor an award to be rendered to a parent."). Because Appellants have failed to establish clear and convincing evidence that Father abandoned the children, we conclude that no ground exists to support terminating Father's parental rights. And as no ground for termination was proven, we need not address whether the children's best interests would support termination. *See, e.g.*, **In re Valentine**, 79 S.W.3d at 550 (stating that "we do not reach the issue of whether termination . . . was in [the child's] best interest" when no grounds for termination have been proven). Accordingly, we affirm the trial court's ultimate ruling to deny Appellants' petition for termination and adoption.

## B. Father's Appellate Attorney's Fees

Father seeks his appellate attorney's fees, arguing that Appellants' appeal was frivolous.[12] Under Tennessee Code Annotated section 27-1-122, this Court may "award

---

[12] Father does not seek to recover his attorney's fees under Tennessee Code Annotated section 36-5-103(c), which authorizes a court to award reasonable attorney's fees to the prevailing party "in any . . . action concerning the adjudication of the custody or change of custody of any children[.]" *See also* **In re**

just damages" when it appears that an appeal "was frivolous or taken solely for delay[.]" "A frivolous appeal is one that is devoid of merit or has no reasonable chance of success." ***Selitsch v. Selitsch***, 492 S.W.3d 677, 690 (Tenn. Ct. App. 2015) (citing ***Wakefield v. Longmire***, 54 S.W.3d 300, 304 (Tenn. Ct. App. 2001)). The statute, however, is to be "interpreted and applied strictly so as not to discourage legitimate appeals." ***Wakefield***, 54 S.W.3d at 304. Although we have not resolved this appeal in Appellants' favor, we are unable to conclude that their appeal is devoid of merit. Accordingly, we decline to award Father attorney's fees pursuant to section 27-1-122.

## V. CONCLUSION

The judgment of the Maury County Chancery Court is affirmed, and this matter is remanded to the trial court for further proceedings consistent with this Opinion. Costs of this appeal are taxed to Appellants Autumn L. and Timothy B.L., for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

---

*Conservatorship of Lovlace*, No. M2003-01274-COA-R3-CV, 2004 WL 1459409, at *8 (Tenn. Ct. App. June 28, 2004) (awarding appellate attorney's fees pursuant to section 36-5-103(c)).